ADRIAN BUCKHANNON BANK *v.* SANDRIDGE & SANDRIDGE, INC., *et al.*

(No. 9040)

Submitted April 30, 1940.   Decided May 28, 1940.

*Steptoe & Johnson, Norman S. Elliott* and *James M. Guiher,* for appellant.

*U. G. Young, Jr.,* and *D. H. Hill Arnold,* for appellees.

HATCHER, JUDGE:

This is a suit to recover from defendant Indemnity Company, surety on the road construction bond of Sandridge & Sandridge, contractors, money advanced by plaintiff Bank to the contractors, enabling them to complete the work. In their application for the bond, the contractors agreed to assign as collateral to Indemnity the amount finally due on the work. Indemnity has paid for the contractors a sum in excess of this amount. The final estimate check was delivered to Indemnity by the State Road Commission. That check is the real bone of contention. Bank recovered a decretal judgment in full of its claim.

The cause was referred to a commissioner, and his history thereof and findings thereon, approved by the trial chancellor, are so able that we copy from them at length, as follows:

"I find that Sandridge & Sandridge, Incorporated, was the successful bidder for building and completing, according to the plans of the State Road Commission, a road in Marion County, West Virginia, known as 'Conaway Bridge —Farmington Project No. 847-A;' that on June 24, (1935) it entered into a contract for the completion of said project and executed a bond as required by the statute with the Glens Falls Indemnity Company as surety thereon, * * *. The bond was signed 'Sandridge & Sandridge, Inc., by Lee J. Sandridge, President, Glens Falls Indemnity Company, by C. R. Morgan, Attorney.'

"I find that for about two and a half months immediately preceding June, 1936, the work on the project had been completely suspended because of lack of funds; that the contractor had exhausted its ability to get funds, and could not provide or procure funds to complete the contract; that prior to or about the first of June, the commission had forced the contractor to resume work without funds to meet its payrolls; that on or about June 5, 1936, Lee J. Sandridge, president of the contractor company, took the books and records of the contractor to Morgan's office in the City of Charleston for the purpose of turning over the books and records to Morgan and making default in the

contract; that Sandridge told Morgan that the surety on the bond would be compelled to take over or finance the project; that Morgan protested against any default on the part of the contractor and stated to Sandridge that the contractor would be able to complete the project at much less cost than would the surety were it forced to do so; that Morgan suggested to Sandridge that he go to the Bank of Adrian for financial assistance; that neither Sandridge nor his company had ever had any dealings with the bank, and Sandridge advised Morgan that he did not know any of the bank officials; that Morgan told Sandridge he would call the cashier of the bank and assist Sandridge in getting the bank to advance the funds; that it was agreed between Morgan and Sandridge that for the funds advanced, the contractor would execute to the bank assignments of the estimates on the work, and a letter authorizing the commission to deliver to Morgan the checks on these assignments, and that Morgan in turn would forward these checks to the bank.

"I further find that Morgan did call the cashier of the bank and advised him that the contractor was in need of funds to complete the contracts; that he, Morgan, represented the bonding company that was surety on the contractor's bond; that if the bank would provide the funds and take assignments on the estimates, he would withdraw the estimate checks and mail the same to the bank; that on his way home from this conference with Morgan, Sandridge talked to the cashier of the bank briefly about the arrangement and a few days later went to the bank where the arrangements were concluded, and the first loan of $410.00 was made, evidenced by note of Sandridge & Sandridge to the bank, payable 'Out of State Estimate—Marion County Project.' It is significant that the cashier of the bank says that he was not advised of the financial condition of the contractor, but Sandridge says that he so advised the cashier. Sandridge & Sandridge, as well as its president, was a stranger to the bank and its officials. No financial statement, recommendation or security on the notes representing these loans, was required. The cashier, Stump, was an experienced banker. At the time of each

loan an assignment of the estimate was made and forwarded to Morgan. The letter from Sandridge and Sandridge to Morgan authorizing him to withdraw checks on the estimates and deliver them to the bank was written to Morgan. The bank was secure if its agreement with Morgan was carried out. No loan was made without an assignment of the estimate. That the financial condition of Sandridge & Sandridge under these circumstances did not enter into the making of the loan is apparent. It is not reasonable to say that the bank would have extended this line of credit to a stranger without investigation as to financial standing, without recommendation, and without security for its loan.

"I, therefore, find that the loans were not made on the credit of Sandridge and Sandridge, Incorporated, but were made on the understanding and agreement between Morgan and the bank, and Morgan's promise to withdraw and deliver the checks to the bank; that in making these loans, the bank relied upon the agreement and promise aforesaid; and that assignments of the estimates were secured and forwarded to Morgan and he was authorized by letter to withdraw the checks from the commission, as agreed.

"Beginning with the month of June, 1936, the plaintiff bank advanced weekly, sums aggregating $16,991.31 to meet the contractor's payrolls until the completion of the contract. These advancements are evidenced by notes executed by the contractor, payable to the bank, 'Out of State Estimates on Marion County Project.' Thirteen notes dated June 8, 1936, and each week thereafter up to and including August 31, 1936, aggregating $8,532.31, were paid from the checks of the commission on current monthly estimates, issued to the contractor, and delivered to C. R. Morgan and by him to the bank. Eleven advancements or loans, as the case may be, evidenced by like notes, payable as above, bearing date of September 7, 1936, and each week thereafter,—the last November 17, 1936, were made. These eleven notes aggregating $8,459.09, exclusive of interest, represent the claim of debt of the bank. The final estimates of the commission for the period from October 1,

1936, to the completion of the project, show due the contractor the sum of $11,065.11, made up of work done and materials furnished, not included in previous current estimates, in the amount of $3,997.92, and retained percentage amounting to $7,531.61. All prior estimates made subsequent to June 8, 1936, under the agreement between the bank and Morgan were applied on the loans made between June and September 7, 1936.

"I further find that at the time of executing the first of the eleven notes, Sandridge & Sandridge executed the following writing: 'For value received in the amount of $735.00 we the undersigned hereby assign and transfer to the Adrian Bank of Adrian, W. Va., the payroll beginning on Aug. 31st and ending on the 5th of September, inclusive, authorizing them to collect with interest from the State Road Commission from any and all funds held by said State Road Commission for percentage retained or money earned by Sandridge & Sandridge, Inc., on the Marion County project known as the Federal Project No. 847-A'. I find that a like writing except as to dates and amounts was executed at the time each of the other ten notes were made; that a like writing except as to dates and amounts was executed for each of the thirteen notes that have been paid, and are not involved in this suit; and that the original or a copy of each of said writings was, with possibly one or two exceptions, promptly forwarded to C. R. Morgan at Charleston. When Morgan advised Stump by telephone on September 22, 1936, that he could not guarantee delivery of final estimate check, the president of the contractor company again took his records and went to Morgan's office 'to see if he (Morgan) would continue on to back me in getting this money as furnished from the bank.' He advised Morgan that without the money the contractor would have to default. Morgan agreed that 'we should go right on' under the same arrangement. Stump was informed as to this last conference, waived his demand on the contractor for 'a letter of credit covering these loans, signed by property owners,' and continued the loans. Morgan in his testimony differentiates at length between

'current' and 'final' estimates, and says that the agreement between him and the bank did not apply to final estimates. On this point we must consider. 1. The testimony of Sandridge that it was agreed between him and Morgan that the bank was to be reimbursed by assignments of the estimates, including the final estimate, if necessary; 2. That in the conversation between Morgan and Stump just previous to the first loan, no distinction or exception was mentioned or made as to the final estimate; 3. Morgan had before him continuously the assignments of Sandridge & Sandridge to the bank wherein it appeared that there was assigned and transferred to the bank 'the payroll, money and all funds held by said State Road Commission for percentage retained or money earned by Sandridge & Sandridge, Inc., on the Marion County Project # #.' Morgan also had before him a copy of the notes showing on their face that they were payable 'out of estimates on Marion County Project,'—not from current estimates or final estimates, but from estimates expressly including funds 'for percentage retained or money earned.'

"I, therefore, find that the agreement between Morgan and the bank, and Morgan's promise to withdraw and deliver the checks to the bank, included all estimates both current and final."

In overruling Indemnity's exception to the last finding the trial chancellor made this comment:

"Another point which has great weight is that just as soon as Morgan telephoned Stump and called his attention to the final estimate Stump promptly called upon the contractor for other and additional security, and promptly thereafter Sandridge went to Morgan with his bookkeeper, and his books, for the purpose of turning over the job or securing financial help, and says Morgan told him to go ahead as theretofore, which was communicated to Stump by Sandridge, and the facts are that they did continue as theretofore. Another significant fact is that there was no change in the wording of the assignments covering the advancements, which were sent to Morgan and of which he had notice of the contents and he raised no objection. * * *

I think the Commissioner has properly found that the agreement was in substance that if Sandridge would go ahead and complete the project that Morgan would arrange with the Bank of Adrian to provide the funds and take assignments on the estimates without distinction as to whether they were current or final estimates."

The brief of Indemnity raises three "fundamental" issues: the purport and effect of the arrangement between Morgan and Bank; the bearing on this transaction of a course of dealing between Morgan and Bank, relating to Bostic & McComas, other road contractors; and the authority of Morgan to bind Indemnity.

We have the same view of the purport and effect of the instant arrangement, as that of the commissioner and trial chancellor, and feel that an attempt to enlarge on what they have said would be supererogation.

The record does not disclose the initial negotiations between Bank and Bostic & McComas. It simply appears that in July, 1935, the latter wrote Morgan requesting him to procure and mail check for their July estimate to Bank, which he did; and during the succeeding year like requests and compliances occurred periodically. That was all Morgan did; he conducted no negotiations with and made no promises to Bank. The dealings of the several parties in the two cases were so different that what was done in the first case is not a pattern for the second. But, avers the brief, "both Stump and Morgan testified that the arrangement made regarding the Sandridge loans was the same as had been had in the prior Bostic & McComas transaction." That is the effect of Morgan's testimony, but it cannot be wholly correct, for, as shown above, the transactions were essentially different. Stump said merely that he was assured by Morgan "that he would withdraw the estimate checks and send them to us as he had previously in another case." Thus, according to Stump, whose testimony was accepted by both commissioner and trial chancellor, the only specified similarity of the transactions was in withdrawing and sending the checks. It would seem that this similarity is all that could have been contemplated, since it

does not appear that Bank was ever apprised of what the relations were between Morgan and Bostic & McComas. We are informed of nothing in the bare assurance of Morgan to withdraw and send the checks, which of itself would set apart the final estimate check from the current estimate checks.

May 25, 1933, Indemnity appointed the C. R. Morgan Company an agent for the purpose of procuring for it acceptable applications for certain named classes of insurance and to "perform generally such other duties and services in connection therewith as shall protect and further at all times the best interests of the Company (Indemnity)." Shortly afterwards, Indemnity executed a power of attorney authorizing C. R. Morgan, Sr., to execute bonds in its name. This paper was filed in the Secretary of State's office. Sometime (date not given) Indemnity, by what is termed "supplemental letter", instructed Morgan "You have no authority to make any kind of a verbal or written agreement after a bond has been executed. This authority rests only with the home office. By disregarding these instructions * * * your action may revive liability causing loss to the Company." The Morgan office was supplied by Indemnity with letterheads bearing its name on which he had imprinted "C. R. Morgan Company, Agent." The "insignia" of Indemnity was in Morgan's office. How he got the insignia (apart from the letterheads) and of what it consisted is not shown, but it does appear that Indemnity knew it was in his office. From all which we are of opinion that Indemnity appointed the Morgan Company as a general agent; clothed it with apparent authority as such; and cannot avoid its representations to third parties by a secret limitation of its authority. *Myers* v. *Summerville,* 90 W. Va. 486, 111 S. E. 487. Furthermore, all of the money supplied Sandridge by Bank was applied on the road construction. If Bank or someone else had not furnished this money to Sandridge, Indemnity would have had to expend an equal or greater amount on the road. Indemnity, therefore, benefited to the full extent of these loans. This benefit resulted from Morgan's arrangement with

Bank. And since Indemnity would knowingly retain the benefit of this arrangement, equity will not heed Indemnity's denial of his authority to make it. *Union Bank & Trust Co.* v. *Lumber Co.*, 70 W. Va. 558, 74 S. E. 674, 41 L. R. A. (N. S.) 663.

The decree is affirmed.

*Affirmed.*

KENNA, JUDGE, concurring.

I concur in the first syllabus point and in the Court's final conclusion because I believe the record discloses a state of fact clearly sustaining the finding of the commissioner and of the trial chancellor to the effect that Indemnity, by authorizing Morgan in its name to execute bonds, by equipping his office with its insignia and letterheads, and by otherwise holding him out as its general agent, had estopped itself to deny his authority so far as his dealings with Bank were concerned. Based upon that view of the proof, Bank and the contractor were led to believe that Morgan was authorized at the inception of his negotiations with them to represent Indemnity and, as I view it, that is the only manner in which Indemnity can be said to have received benefits from Bank.

Naturally, the surety upon a contractor's bond is indirectly benefited by any assistance rendered the contractor in the performance of his undertaking which minimizes possible liability. This, however, is not the sort of benefit the retention of which constitutes ratification of the acts of an alleged agent. Assistance in the performance of the contract can only directly benefit the surety upon the contractor's bond after the surety has taken over performance or has become obligated to do so. There was no formal breach of the obligation of the bond in this case. Save through Morgan, Indemnity was not charged with knowledge that the contractor had "thrown up the sponge" prior to complete performance. The contract was surrendered and taken over by Indemnity by the conduct of Morgan. If that is not so, then the advancements of Bank

to the contractor, not directly to Indemnity, did not redound to the direct benefit of Indemnity, and would not constitute a circumstance on which a ratification of Morgan's conduct could be based. If Morgan *was* the agent of Indemnity, held out by it as being authorized to act from the inception of the transaction with Bank, then Indemnity directly received benefit from the loans advanced by Bank to the contractor. If Morgan was not then Indemnity's duly constituted agent, his agreement with Sandridge & Sandridge, Inc., did not amount to an assumption by Indemnity of its conditional obligation to complete performance of the contract, the bond had not been breached and any benefit that Indemnity got as a result of Bank's loans to the contractor was entirely too indirect and remote to constitute a basis for ratification.

For the foregoing reasons, I believe that the second syllabus point is based upon a state of facts the existence of which depends upon Morgan's having been held out by Indemnity as its agent. That agency being a condition precedent to Indemnity receiving direct benefits, I do not agree that it may be established by its conduct after their receipt.